# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOHN SANDERS, JR. | ) | Case No.  1:13C416 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | |
| ACTING COMMISSIONER OF | ) | MEMORANDUM OPINION & ORDER |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income ("SSI").  ECF Dkt. #1.  Plaintiff asserts that the Administrative Law Judge ("ALJ") incorrectly analyzed his schizoaffective disorder under Listing 12.03 rather than under Listing 12.04, the ALJ failed to properly apply the treating physician rule, and the ALJ erred in the residual functional capacity ("RFC") that he determined for Plaintiff. *Id.*

For the following reasons, the Court finds that the ALJ properly applied the treating physician rule and substantial evidence supports his determination to attribute less than controlling weight to the later opinions of Dr. Rodio and to find that Plaintiff's impairment did not meet or equal Listings 12.03 and 12.04.  The Court therefore AFFIRMS the ALJ's decision and DISMISSES Plaintiff's complaint in its entirety with prejudice.

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

1

## I. PROCEDURAL HISTORY

Plaintiff applied for SSI benefits on March 6, 2006 after serving a lengthy prison sentence. Tr. at 76-78; 144. Plaintiff alleged disability beginning January 15, 1984 due to schizophrenia and antisocial personality disorder. *Id*. at 76, 110. The Social Security Administration ("SSA") denied Plaintiff's application on initial determination and upon reconsideration. *Id*. at 31-348. Plaintiff requested a hearing before an ALJ, which was held on December 8, 2008. *Id.* at 31-38, 605. Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified at the hearing. *Id.*

On February 27, 2009, the ALJ found that Plaintiff had the severe impairment of schizoaffective disorder. Tr. at 19. However, he found that this impairment did not meet or equal the Listing of Impairments in 20 C.F.R. Part 4, Subpart P, Appendix 1. *Id.*. The ALJ further found that Plaintiff had the RFC to "perform a full range of work at all exertional levels but with the following nonexertional limitations: Mr. Sanders can understand, remember and carry out simple, one-to-two step instructions. He is limited to only occasional interaction with co-workers and supervisors. He cannot perform work requiring direct interaction with the general public." *Id*. at 21. The ALJ further found that Plaintiff had no past relevant employment, but he could perform a significant number of jobs existing in the national economy, such as laundry worker, kitchen helper and cleaner/housekeeper. *Id*. at 27.

Plaintiff requested that the Appeals Council review the ALJ's decision and the Appeals Council granted the request because the record upon which the ALJ's decision was based could not be located. Tr. at 11-13. The Appeals Council therefore vacated the ALJ's decision and remanded the case to the ALJ for a new decision. *Id.*

However, the Appeals Council thereafter issued an order vacating its prior order of remand after locating Plaintiff's claims file.  Tr. at 8.  On January 31, 2013, the Appeals Council denied Plaintiff's request for review, finding no basis for reviewing the decision.  *Id*. at 2.  Plaintiff filed an appeal to this Court and Defendant answered.  ECF Dkt. #1, 9.  Both parties consented to the jurisdiction of the undersigned and have filed briefs addressing the merits of the case.  ECF Dkt. #s 11, 14, 15, 19, 20.  At issue is the decision of the ALJ dated February 27, 2009, which stands as the final decision.  Tr. at 17-28.

**II.**      **SUMMARY OF MEDICAL EVIDENCE**

While he was in prison, Plaintiff received mental health treatment for schizophrenia and antisocial personality disorder.  Tr. at 477-491, 495.  He was in the general population at the prison and was asymptomatic upon being placed on medication at the prison.  *Id*. at 495, 497.  He obtained his GED while in prison and had no interpersonal conflicts or misconduct reports.  *Id*. at 497.  He was advised to sign up for vocational training and was working as a porter in his unit.  *Id*. at 513, 520.  He enjoyed playing pool and chess while in prison.  *Id*. at 520.

The record includes progress notes from Recovery Resources who treated Plaintiff upon his release from prison from January 11, 2006 through October 24, 2008.  *Id*. at 149-387, 396-472.  Plaintiff received weekly counseling with a social worker and monthly medication management appointments with Dr. Rodio, a psychiatrist.  *Id*.  Treatment notes show that he was prescribed Trilafon, Cogentin and Prozac as far back as 2001.  *Id*. at 477-491.

At his first appointment with his counselor, Plaintiff was calm and cooperative and reported that he was adjusting well to living in a group home.  Tr. at 472.  Dr. Rodio thereafter met with Plaintiff and performed a mental status examination.  *Id*. at 471.  Dr. Rodio noted that Plaintiff attended school until the tenth grade and dropped out when he started hanging out at a pool hall and

with a "bike gang."  *Id*.  Plaintiff reported that he began using marijuana daily during his teenage years and recalled a four-month period between prison terms of using crack cocaine and the intermittent use of alcohol.  *Id*.  Dr. Rodio also noted that Plaintiff spent a total of 23 years in prison, with his most recent imprisonment being 12.5 years for aggravated robbery.  Tr. at 471.

Plaintiff explained that he began experiencing auditory hallucinations at the age of 23 while he was in prison.  Tr. at 470.  They were sometimes accompanied by depressive symptoms such as crying or not eating.  *Id*.  He was taking Prozac, Cogentin and Trilafon.  *Id*.

Upon examination, Dr. Rodio found that Plaintiff's speech was spontaneous and carefully chosen and he was alert and oriented.  Tr. at 471.  He reported that he was less likely to have hallucinations when he was around other people.  *Id*. at 467.  He indicated that his mood was not too good and he had experienced some paranoid feelings earlier in the day and a negative force coming against him in the group home where he was staying.  *Id*.  Dr. Rodio diagnosed Plaintiff with undifferentiated schizophrenia, cannabis dependence and nondependent cocaine abuse.  *Id*. at 469. His plan was to increase the Trilafon and to keep the dosages of Prozac and Cogentin the same.  *Id*.

On January 6, 2006, Nancy Lorent from Recovery Resources completed an agency questionnaire concerning Plaintiff and indicated that he lived in a 3/4 group home where he was monitored by an administrator who lived upstairs in the family home.  Tr. at 564.  She opined that Plaintiff could not live independently because he had difficulty with daily tasks, poor organizational skills and disorganized thought processes.  *Id*.  She noted that he depended upon others to do things such as cooking and he was forgetful.  *Id.*  She indicated his diagnoses of undifferentiated schizophrenia and hallucinations and noted that he visited with family two to three times per week. *Id.*  She explained that he had only two past jobs in his life and had spent most of his adult life in prison.  *Id*.  She opined that Plaintiff could not return to work due to his hallucinations as medications

only helped up to a point.  *Id.*  She noted that he was childlike, forgetful, disorganized and became anxious, he was very dependent upon others and was paranoid of others.  *Id.*  Dr. Lorent indicated that Plaintiff required help from others, including a mental health team, his Parole Act team, his sister, residents, and the group home administrator.  *Id.* at 565.

Plaintiff reported to his counselor on January 26, 2006 that he was doing well on the medications but still experiencing some hallucinations, although he was able to ignore them.  Tr. at 466.  He showed good concentration and was calm and cooperative.  *Id.*  Dr. Rodio noted on February 8, 2006 that Plaintiff's  thoughts were organized and reality-based and he reported that the voices that he heard were reduced.  *Id.* at 465.  He referred to a pattern of hallucinations and sometimes saw a shadow that appeared, then disappeared, which made him curious.  *Id.*  He described his mood as good and his affect as calm. *Id.*

Dr. Rodio added Vistaril to Plaintiff's medications in March of 2006 after Plaintiff reported good results on it while he was in prison.  Tr. at 464.  Plaintiff indicated that he still saw some shadows and described his mood as "all right—energized."  *Id.*

On March 29, 2006, Dr. Rodio completed an agency form indicating that he first saw Plaintiff on January 18, 2006 and last saw him on March 1, 2006.  Tr. at 593. He found that his hygiene was good and noted that Plaintiff's left finger had tremulousness.  *Id.*  He described Plaintiff's conversation and speech as deliberate and his mood and affect as "all right" with placid effect.  *Id.*  Plaintiff described his recent history of seeing shadows and Dr. Rodio found that Plaintiff had fair concentration and memory with a concrete intellectual approach.  *Id.*  Plaintiff's insight and judgment were described as ambivalent and he diagnosed Plaintiff with undifferentiated schizophrenia, marijuana dependence and cocaine abuse in remission.  *Id.* at 594.  Dr. Rodio identified Plaintiff's medications and indicated that Plaintiff could not manage his own benefits if granted.  *Id.*  Dr. Rodio

opined that Plaintiff's prognosis was fair and he found that Plaintiff's ability to remember, understand and follow directions was adequate for simple and short instructions.  *Id*.  He opined that Plaintiff had limited ability to maintain attention due to his cognitive style, had fair ability to sustain concentration and persist at simple tasks and limited ability for sustained requirements.  *Id.*  Dr. Rodio further concluded that Plaintiff's social interaction abilities were passive and polite, but he was easily swayed.  *Id*.  He opined that Plaintiff adapted best in a settled routine and work pressures put him at risk for exacerbation of auditory hallucinations, increased distractability and confusion by more than simple tasks.  *Id.*

Plaintiff's counselor reported in June of 2006 that Plaintiff denied experiencing hallucinations or side effects from his medications.  Tr. at 461.  His thought processes were described as "childlike."  *Id.*  Plaintiff reported that he was sleeping well and his appetite was good.  *Id*. Later in June, Plaintiff reported seeing shadows on the walls but he admitted that they may just be shadows and his paranoia made him think that they were ghosts or threatening objects.  *Id*. at 459.

On June 1, 2006, Dr. Felker examined Plaintiff for the agency.  Tr. at 586.  Plaintiff arrived at his evaluation with his caseworker from the group home.  *Id*.  He informed Dr. Felker that he dropped out of school in the tenth grade and had been in regular classes.  *Id*.  He last worked in 1993 as a security and parking lot attendant.  *Id.*  He described his history of substance abuse and explained that he had been clean for 12 years.  *Id*.  He also noted that he had a history of gambling.  *Id*.  He also indicated that he was diagnosed with schizophrenia while he was in prison..  *Id.*  He reported difficulty adjusting to life outside of prison.  *Id*. at 587.

Plaintiff told Dr. Felker that he was mildly depressed and anxious and he had poor motivation.  Tr. at 587.  Dr. Felker found Plaintiff mildly depressed during the interview.  *Id.*  Plaintiff reported

-6-

variable sleep habits and occasional crying spells and he indicated that he attempted suicide twice while in prison and once set his cell on fire.  *Id.*

Dr. Felker found no paranoid thoughts and she noted that Plaintiff denied any history of auditory or visual hallucinations.  Tr. at 587.  Plaintiff acknowledged that he saw shadows.  *Id.*  His attention and ability to concentrate were impaired.  *Id.*  His insight and judgment were described as "doubtful" due to his release from prison since he had spent most of his adult life in prison.  *Id.* at 588.

Plaintiff described his daily routine which consisted of getting up at 7:00 a.m., washing himself and getting dressed, eating, reading the Bible, visiting his sister or Recovery Resources, walking around the city looking for work, attending AA meetings, going to the library and returning to the group home around 7:00 p.m. for dinner.  Tr. at 588.  He then watched television, read, or talked to his roommate.  *Id.*

IQ testing placed Plaintiff in the average range of intellectual functioning and his memory functioning was at a dull normal range to somewhat below level.  Tr. at 588-589.  Achievement testing  showed that Plaintiff was beyond his formal level of education in reading, spelling and sentence comprehension and his score in math placed him below his level of formal education and intellectual ability.  *Id.* at 589.

Dr. Felker diagnosed Plaintiff with adjustment disorder, antisocial personality disorder and polysubstance abuse in remission.  Tr. at 589.  She opined that Plaintiff was mildly impaired in following routine instructions, and moderately impaired in concentration and attention, dealing with the general public, relating to co-workers and supervisors, and dealing with workplace stressors.  *Id.*

On June 26, 2006, Ms. McCarthy of the agency completed a psychiatric review technique and mental RFC form for the agency.  Tr. at 566-583.  She reviewed the record and assessed Plaintiff's

impairments from February 1, 2006 through June 23, 2006 under Listing 12.04 for affective disorders based upon Plaintiff's adjustment disorder with depressed mood, Listing 12.06 for anxiety-related disorders for Plaintiff's adjustment disorder with anxiety, Listing 12.08 for personality disorders for Plaintiff's antisocial personality disorder, and Listing 12.09 for substance abuse disorders for Plaintiff's polysubstance dependence in remission. *Id.* at 566-574.  She found that Plaintiff's impairments mildly restricted his activities of daily living, caused moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and did not cause him to experience any episodes of decompensation. *Id.* at 576.  As to Plaintiff's mental RFC, Ms. McCarthy concluded that Plaintiff was not significantly limited in: remembering locations and work-like procedures; understanding, remembering and carrying out very short and simple instructions; performing activities within a schedule, maintaining regular attendance and being punctual; sustaining an ordinary routine without special supervision; making simple work-related decisions; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; maintaining socially appropriate behavior; being aware of normal hazards; traveling in unfamiliar places and taking public transportation; and in setting realistic goals or making plans independently of others. *Id.* at 580-581.  She found that Plaintiff was moderately limited in: understanding, remembering and carrying out detailed instructions; maintaining concentration and attention for extended periods; working in coordination with others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; getting along with corworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately

to changes in the work setting. *Id.*

In her functional capacity assessment, Ms. McCarthy reviewed evidence showing that Plaintiff's full scale IQ was 95, his verbal IQ was 100 and his performance IQ was 87. Tr. at 582. She noted that Plaintiff scored higher intellectually than his treating doctor reported. *Id.* She explained that Plaintiff had the ability to complete his daily living activities with little or no difficulty, and he had a structured lifestyle as he lived in a group home. *Id.* She noted that he was able to take care of his hygiene and eat when food was provided to him and to read and leave home by himself. *Id.* She further found that Plaintiff had some problems with concentration and attention, but was able to remember, understand and communicate effectively in order to complete simple one and two step tasks that are of low stress. *Id.* She further found that Plaintiff should avoid jobs that deal directly with the public on a regular basis. *Id.*

In early July of 2006, Plaintiff made no mention of shadows or voices and denied medication side effects. Tr. at 458. Plaintiff also denied hallucinations and mood swings in August of 2006, reporting that he was sleeping well and not experiencing any side effects from his medications. Tr. at 453. His behavior was described as within normal limits for him. *Id.* at 451. He indicated that he was getting along well with others at the group home. *Id.*

In September of 2006, Plaintiff reported increased anxiety because his roommate at the group home moved out and the lights outside of the building were shining through his windows and making shadows that scared him. Tr. at 448-449. At his September 18, 2006 visit, Plaintiff reported a stable good mood and he denied hallucinations or other shadows. *Id.* at 447.

On October 4, 2006, Dr. Rodio indicated that Plaintiff was completing his participation in Anger Management classes and he reported that he was more likely to experience hallucinations when

he was alone with no distractions.  Tr. at 444.  Dr. Rodio noted that when he asked about Plaintiff's mood, he struggled to identify his mood but instead focused on how hungry he was.  *Id*.  Plaintiff reported seeing shadows when in a dark room alone.  *Id*. at 443.

On November 6, 2006, Plaintiff reported that he had moved into a new group home and he was doing his own shopping and cooking.  Tr. at 440.  However, he only bought hotdogs, corn chips and soda at the store and had to get food from the group home owners.  *Id*.  Plaintiff said he was happy with his new group home and stated that it was not haunted like the last one.  *Id*.  Plaintiff was informed about choosing foods for a balanced diet and arrangements were made for food shopping to be completed with another individual.  *Id*.

On March 5, 2007, Dr. Rodio completed an agency form indicating that he began treating Plaintiff on January 18, 2006 and last saw him on February 28, 2007.  Tr. at 561.  He found Plaintiff's appearance to be appropriate, his speech deliberate and not pressured, his mood was irritable toward his roommate, his affect was placid and Plaintiff reported a recent history of auditory and visual hallucinations.  *Id*.  Dr. Rodio found Plaintiff's cognitive functioning to be distractible and concrete and he diagnosed him with undifferentiated schizophrenia for the last 25 years.  *Id*. at 562.  He indicated that he had prescribed Trilafon, Vistaril, Prozac and Cogentin which lessened his hallucinations but they were still present.  *Id*.  He opined that Plaintiff was not able to manage any benefits that may be due and found that his ability to remember, understand and follow directions was adequate for simple instructions and his ability to maintain attention was limited due to his cognition.  *Id.*  He found that Plaintiff's ability to sustain concentration and to persist and complete tasks in a timely fashion were fair for simple tasks and his social interactions were passive and polite and Plaintiff was easily swayed by outside influences.  *Id*.  He opined that Plaintiff benefits from a basic

and settled routine and work pressure would worsen his auditory and visual hallucinations and he would be distracted by peers.  *Id*.

On March 30, 2007, Dr. Semmelman, Ph.D. of the social security agency made contact with Plaintiff's parole officer and wrote a report.  Tr. at 93.  Plaintiff's parole officer indicated that she saw Plaintiff twice per month and he was one of her lower functioning clients.  *Id.*  The officer reported that Plaintiff came across with the cognitive abilities of a young teenager and he would have difficulty following three-step commands but could follow two-step commands.  *Id.*  The parole officer also stated that she was concerned about Plaintiff living alone as she did not think that he could put a good meal together.  *Id*.  She reported that all of his drug screens were negative and he liked being in the program.  *Id*.  She indicated that Plaintiff was likeable and would do better in a job situation where others were there, but he had problems with concentration and attention.  *Id*.  She did not think that Plaintiff could handle the stress of a job setting.  *Id*.

In March of 2007, Plaintiff requested that the Vistaril be stopped due to improvements in his anxiety.  Tr. at 422.  Dr. Rodio discontinued the medication.  *Id*.  Plaintiff also reported seeing things run across the floor of the group home at dark but he stated that they were not really there and they did not scare him.  *Id*. at 425.  He reported that he was sleeping well and his mood was stable.  *Id*.

In April of 2007, Plaintiff reported that he was sleeping well and he denied anxiety, hallucinations and mood swings.  Tr. at 420.  His affect was within normal limits.  *Id*.  He also indicated that since the Vistaril had been discontinued, it was easier to wake up in the morning and he had no increase in his anxiety.  *Id*. at 418.  In late April, Plaintiff reported seeing shadows on the walls or floors, but he remarked that they were not bothersome to him.  *Id*. at 416.

-11-

On May 17, 2007, Dr. Semmelman, Ph.D. conducted a case analysis for the agency and indicated that the treatment notes in the file from at least 2003 showed that Plaintiff was diagnosed with schizophrenia-paranoid, but that his symptoms were in good remission with medication compliance. Tr. at 492. She noted that Plaintiff's IQ testing showed that he was in the average range of intelligence and the caseworker's statement that Plaintiff had no concept of money was unsupported by Plaintiff's math scores and overall average on testing. *Id*. She also questioned the reports that Plaintiff had psychotic symptoms even while on medications because the prison records did not support this. *Id*. Dr. Semmelman also explained that while the caseworker reported that Plaintiff had nightmares and visual hallucinations, the prison notes show that he slept well and no indications of hallucinations were documented in those records. *Id*.

In June of 2007, Plaintiff admitted to smoking marijuana. Tr. at 412. He denied hallucinations and depression, although he stated that the shadows remained but did not bother him. *Id*. In July of 2007, Plaintiff reported still seeing shadows and he was hearing voices. *Id*. He indicated that he was anxious over losing his placement in the group home. *Id*. at 406-410. He stated on July 23, 2007 that he often felt that he was being followed by someone in his family that was dead. *Id*. at 404.

On August 1, 2007, Plaintiff reported that he was anxious about moving into his sister's home and he was seeing shadows. Tr. at 403. Plaintiff's affect was described as serious. *Id.* In September of 2007, Plaintiff reported that he was no longer seeing the shadows since moving in with his sister. *Id.* at 402. He indicated that he was sleeping well and his affect was appropriate. *Id*.

On October 3, 2007, Dr. Rodio completed a medical source statement as to Plaintiff's mental capacity. Tr. at 474. He found that Plaintiff had fair abilities to:  follow work rules and use judgment;

understand, remember and execute simple job instructions; socialize; and leave home on his own.  *Id.* at 474-475.  Dr. Rodio opined that Plaintiff had poor or no abilities to:  maintain concentration and attention for extended periods of two-hour segments; respond appropriately to changes in the work setting; maintain regular attendance and punctuality; deal with the public; relate to co-workers; interact with supervisors; function independently without supervision and work in coordination with others without being unduly distracted or distracting; deal with work stresses; complete a normal workday or workweek without interruptions from psychologically-bases symptoms; understand, carry and execute complex job instructions; behave in an emotionally stable manner; relate predictably in social situations; and manage funds and schedules.  *Id.*  Dr. Rodio commented that Plaintiff's illness was marked by ongoing auditory hallucinations and when Plaintiff was around others, he became distant because he used others' presences to distract himself from the voices.  *Id.*  He further noted that Plaintiff's usual demeanor was withdrawn and deliberate and he lacked the proactive skills necessary for a work setting.  *Id.* at 475.

On January 7, 2008, Plaintiff's sister called Recovery Resources and reported that Plaintiff spent as much time as he could in bed and she was not sure what to do.  Tr. at 274.  She indicated that she would like to see Plaintiff back in a supervised group home, and the representative agreed, but informed Plaintiff's sister that the problem was that Plaintiff had no income.  *Id.*  At his next medication management appointment, Plaintiff agreed that he would set his clock to wake up and once he awakened, he would stay up rather than go back to sleep for the rest of the day.  *Id.* at 272.  He denied hallucinations or mood swings.  *Id.*

On January 10, 2008, Plaintiff reported that he wanted to find a job so that he could live on his own.  Tr. at 271.  He denied mental or physical health problems and indicated that he had been attending his drug and alcohol groups.  *Id.*  On January 23, 2008, Plaintiff reported that he was still seeing shadows, but denied hearing voices.  *Id.* at 266.  On January 28, 2008, Plaintiff reported that

he had left his sister's home and stayed at the group home where he was staying previously. *Id*. at 264. He said that it was getting too much for him at his sister's house and he wanted to move back into the group home. *Id*. He was advised that in order to do so, he had to have income and pay rent. *Id*. His recovery team agreed to assist and support Plaintiff with finding employment and housing issues. *Id*. Plaintiff returned to living with his sister, but was focused on returning to the group home and finding employment. Tr. at 254-261. Plaintiff reported on February 22, 2008 that the shadows had decreased significantly and while he indicated that he wanted to move out of his sister's house, he had not pursued other avenues or looked for a job. *Id.* at 247. He denied mood swings and his affect was stable. *Id.*

In March 2008, Plaintiff reported that he was doing well with no mental health symptoms and he was moving to another apartment with his sister, but he still desired to get his own place. Tr. at 215. He understood that he needed to find a job. *Id.* In May of 2008, Plaintiff's food stamp assistance had expired and Plaintiff had difficulty understanding how to reapply for them. *Id*. at 187. He reported that he was removed from his sister's house because he did not provide food for the house. *Id.* Plaintiff reported taking his medications. *Id.* On May 8, 2008, Plaintiff reported that he had plans to go with a representative to have his food stamps reinstated. *Id*. at 186.

Dr. Rodio reduced the dosage of Plaintiff's Trilafon at Plaintiff's request on May 14, 2008. Tr. at 184. On May 27, 2008, Plaintiff admitted to visual hallucinations, but said that they were decreasing and were not shadows anymore. *Id.* at 182. He felt sad about his unstable housing. *Id.*

On May 14, 2008, Dr. Rodio completed a mental RFC assessment for Plaintiff, opining that he was moderately limited in his abilities to: understand and remember locations and work-like procedures and very short and simple instructions; execute very short and simple instructions; make simple work-related decisions; interact appropriately with the general public; ask simple questions or for assistance; be aware of normal hazards and take appropriate precautions; and to travel in

unfamiliar places or take public transportation.  Tr. at 392.  He opined that Plaintiff was markedly limited in his abilities to: understand, remember and execute detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; work in coordination with others without being distracted by them; complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  *Id*.  Dr. Rodio commented that Plaintiff had a 2.5 decade long history of depression marked by tearfulness, lack of appetite, insomnia, loss of motivation and suicidality.  *Id*. at 393.  He noted that Plaintiff had experienced auditory hallucinations since his 20's and he did not complete high school as he demonstrated signs of intellectual handicap.  *Id*.  He opined that Plaintiff's withdrawal, lack of motivation, concrete intellectual approach and distraction secondary to voices would impair any work efforts.  *Id*.

On June 5, 2008, Plaintiff was informed that he was released from parole.  Tr. at 177.  His sister was present at the meeting with Recovery Resources support personnel and it was noted that she was assuming responsibility for Plaintiff "due to client[]s inability to live independently."  *Id*.  Plaintiff indicated that he was much more comfortable living with his sister and he was encouraged to help his sister by doing household chores and looking for a job.  *Id*.  Plaintiff's goals were reviewed with him by the Recovery Resources personnel and it was noted that he had achieved the goals of staying healthy, taking care of his mental health, being released from parole and getting his food stamps reinstated.  *Id*. at 176.  He did not achieve the goals of getting back into the community without experiencing stress and anxiety or of moving out of his sister's home as he failed to learn

-15-

independent living skills.  *Id.*

On June 11, 2008, Dr. Rodio drafted a letter indicating that Plaintiff had received treatment from Recovery Resources for many years and received antidepressants and antipsychotic medications for his mental illness.  Tr. at 390.  He opined that Plaintiff required the support and caregiving of his sister to provide basic stability because Plaintiff was unable to care for his needs independently.  *Id.*

On November 17, 2008, Dr. Rodio completed a medical source statement opining that Plaintiff had fair abilities to:  follow work rules; use judgment; function independently without special supervision; work in coordination with others without being distracted by them or distracting them; complete a normal workday or workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember and carry out simple job instructions; socialize; manage funds and schedules; and leave home on his own.  Tr. at 147-148.  He found that Plaintiff had poor to no abilities to: maintain attention and concentration for extended periods of two hour segments; respond appropriately to changes in the work setting; maintain regular attendance and be punctual; relate to co-workers; interact with supervisors; understand, remember and carry out complex or detailed job instructions; behave in an emotionally stable manner; and relate predictably in social situations.  *Id.* Dr. Rodio stated that Plaintiff's pattern of depression and sufferance from residual hallucinations combined to "significantly impair his capacity to handle stress and causes him to withdraw from others."  *Id.* at 148.

## III.      SUMMARY OF TESTIMONIAL AND OTHER RELEVANT EVIDENCE

On March 6, 2006, Plaintiff presented in person to file for his SSI and was accompanied by his caseworker.  Tr. at 108.  The agency interviewer remarked that Plaintiff had difficulty answering questions as he would begin to answer a question and she would have to stop and correct him and get him back on the right path.  *Id.*  The agency interviewed noted that Plaintiff's mannerisms seemed to

be child-like and he was very quiet and serious. *Id.*

On April 3, 2006, Plaintiff's case manager, Ms. Pease, completed Plaintiff's function report for him. Tr. at 135-143. She indicated that Plaintiff lived in a group home with other mentally ill adults. *Id.* at 135. She reported that Plaintiff always needed breaks and was always tired, and he could dress, bathe, and care for his hygiene and needed no reminders in order to take his medications. *Id.* at 136-137. She noted that the group home cooked for Plaintiff but Plaintiff could perform chores, although he had difficulty completing them. *Id.* at 137-138. He could go out alone and shopped once per season for clothes, but someone had to help him shop because he did not understand sizing or how to add or subtract. *Id.* at 138. She reported that he tried to pay attention, but was very uneducated and had a difficult time understanding what was asked of him. *Id.* at 139-140. She further noted that Plaintiff had trouble remembering things and had to look at appointment cards to remember his appointments. *Id.* at 141. Ms. Pease also indicated that Plaintiff had trouble with everyday tasks such as knowing bus schedules and appointments. *Id.* at 142. She further commented that Plaintiff's lack of cognitive ability and common sense prevented him from living on his own. *Id.* at 143.

On February 26, 2007, Nancy Lorent of Recovery Resources completed a function report for Plaintiff and indicated that Plaintiff fixes simple meals, attends appointments and visits with his sister a couple times per week, as well as group sessions at his mental health agency. Tr. at 128. She indicated that Plaintiff reported that he suffered from nightmares and reported seeing dead people in the form of shadows, he heard the voices of dead relatives and friends and he had racing thoughts that disrupted his sleep. *Id.* She noted that Plaintiff was supervised for his cleanliness and hygiene, and he received assistance for eating properly and reminders for his appointments. *Id.* at 128-129. He received help preparing meals and performed chores with assistance. *Id.* at 129-130. He had poor money management skills Ms. Lorent noted that Plaintiff had to be removed from one group home because that thought that the home was possessed and he became sleep deprived. *Id.* at 133. She also

indicated that Plaintiff was often child-like and was very dependent upon others. *Id*. She opined that Plaintiff would not be able to hold employment due to his mental condition. *Id*. at 134.

At the December 8, 2008 hearing held before the ALJ, Plaintiff testified and was represented by counsel. Tr. at 605. Plaintiff testified that he spent a good amount of his life in prison and received mental health care while incarcerated. *Id*. He explained that upon his release from prison, he was set up with Recovery Resources in order to continue mental health services and he was placed in a group home as well. *Id*. at 610-611. Plaintiff related that he treated with Dr. Rodio once a month and met with a counselor once a week for medication management. *Id*. at 611-612. He also has a case manager with whom he met once per week. *Id*. at 612. He stated that he did not have a driver's license and had not used public transportation. *Id*. at 612-613.

Plaintiff testified that he saw shadows everyday and it is not troubling to him anymore because he was getting used to it. Tr. at 613. He stated that he hears a voice that comes and goes and turning on the television and taking his medication helps with the voices. *Id*. at 614. When asked if the medication helps with voices, Plaintiff indicated that he does not hear the voices when he takes his medication. *Id.*

Plaintiff reported that he was living with his sister and he sweeps and mops the floors, but does not do laundry and does not grocery shop. Tr at 614-615. He indicated that he goes for walks and used to walk to AA and NA meetings until he graduated from those programs. *Id*. at 614. He testified that he spends his time walking and reading the Bible. *Id*. at 615. He stated that he has no income and he finished the ninth grade. *Id*. at 616. He can add and subtract. *Id.*

Plaintiff answered yes when the ALJ asked him if going to a group home was part of his parole program. Tr. at 617. Plaintiff indicated that he got along with others at the group homes. *Id.* He explained that he had been living with his sister for the last year and he can cook items like bacon and eggs. *Id*. at 619-620, 622. He also explained that he did not like to go places because "it's drugs out

there." *Id*. at 620.  Plaintiff stated that he would like to live on his own but he would need help with cleaning up, doing laundry and taking his medications.  *Id*. at 621.  He stated that he used to wash clothes when he was in prison and he could use a washing machine.  *Id*.

The vocational expert ("VE") also testified.  Tr. at 622.  The ALJ asked the VE to assume a hypothetical person with Plaintiff's age, education and background with an ability to perform a full range of work with limitations to understanding, remembering and carrying out simple one-to-two step instructions, occasional interaction with co-workers and supervisors, and no direct interaction with the public.  *Id.* at 623.  The VE testified that the hypothetical person could perform the jobs of laundry worker, kitchen helper, or cleaner/housekeeper, all of which existed in significant numbers in the national, state and local economies.  *Id.* at 623-624.

Plaintiff's counsel modified the ALJ's hypothetical, asking the VE to assume the same hypothetical person as that presented by the ALJ, but with the additional restriction that the hypothetical person would be off task 10 to 20 percent of the time.  Tr. at 625.  The VE concluded that the hypothetical person could perform the jobs but could not sustain the job due to the frequency of being off task.  *Id.*

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to SSI.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§20 C.F.R. 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (§§20 C.F.R.  404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of

vocational factors (§§20 C.F.R. 404.1520(d) and 416.920(d)(1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§20 C.F.R. 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§20 C.F.R. 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and RFC. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.      STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.; Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d

-20-

365 (6th Cir. 1984).

**VI.**     **ANALYSIS**

    **A.**     **LISTING OF IMPAIRMENTS**

        Plaintiff first asserts that the ALJ used the wrong Listing in analyzing his schizoaffective disorder and determining whether it met or equaled a Listing at Step Three in the sequential analysis. ECF Dkt. #19 at 10-11. Plaintiff contends that the ALJ should have evaluated his impairment under Listing 12.04 and found that he met the requirements of Listing 12.04A and B or Listing 12.04C. *Id.* at 11-16.

        The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity. 20 C.F.R. § 416.920. In the third step of the analysis to determine a claimant's entitlement to disability insurance benefits, it is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987). In order to meet a listed impairment, the claimant must show that his impairment meets all of the requirements for a listed impairment. *Hale v. Sec'y,* 816 F.2d 1078, 1083 (6th Cir. 1987). An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). An impairment or combination of impairments is considered medically equivalent to a listed impairment "* * *if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments." *Land v. Sec'y of Health and Human Servs.*, 814 F.2d 241, 245 (6th Cir.1986)(per curiam). Generally, an ALJ should have a medical expert testify and give his opinion before determining medical equivalence. 20 C.F.R.§ 416.926(b). In order to show that an unlisted impairment or combination of impairments is medically equivalent to a listed impairment, the claimant "must present medical findings equal in severity to *all*

the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531.

The Court first notes that at the hearing before the ALJ, Plaintiff's counsel specifically referred the ALJ to Listing 12.03, stating that "I submit that there is substantial evidence in this record to demonstrate that this gentleman meets listing section 12.03." Tr. at 609. Counsel thereafter proceeded to explain why Plaintiff's impairment met that Listing. The ALJ specifically addressed this Listing in his decision. *Id*. at 19-20. Counsel mentioned no other Listings.

Further, Plaintiff provides no legal authority to warrant a holding that an ALJ is required to specifically state in his decision each listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 and how a claimant's impairments or combination thereof meet or do not meet each listing. While the ALJ in this case did not specifically refer to Listing 12.04 in his decision, he did address Listing 12.03 by reciting its requirements and explaining why Plaintiff's impairment did not meet that Listing. Tr. at 19-20. He also indicated that he had considered the record in its entirety, he set forth the evidence regarding Plaintiff's impairments, and he specifically stated that "Mr. Sanders does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926)." *Id*.

Finally, even if the ALJ erred by not specifically addressing Listing 12.04, it is harmless error because the criteria for Listing 12.03B and C and 12.04B and C are nearly identical and the ALJ adequately addressed Listing 12.03B and C. The only differences between the two Listings are in the "A" sections of each and the beginning of the "C" sections. The Listings state as follows:

> 12.03 Schizophrenic, paranoid and other psychotic disorders: Characterized by the onset of psychotic features with deterioration from a previous level of functioning. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> > A. Medically documented persistence, either continuous or intermittent, of one or more of the following:
> >
> > > 1. Delusions or hallucinations; or

-22-

2. Catatonic or other grossly disorganized behavior; or

3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:

> a. Blunt affect; or
> b. Flat affect; or
> c. Inappropriate affect;

OR

4. Emotional withdrawal and/or isolation;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

12.04 Affective disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion

that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractibility; or
g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

-24-

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listings 12.03 and 12.04.

Neither party appears to dispute that Plaintiff meets the "A" section for either Listing.  Further, as demonstrated, the "B" and "C" criteria of the Listings is nearly identical, except for the beginning sentence in part "C" requiring differing medically documented history, which, again, neither party disputes.

The parties do dispute whether substantial evidence supports the ALJ's "B" criteria analysis. Plaintiff cites to evidence in the record showing that he was residing in a group home with other mentally ill adults where his meals were prepared for him and he was supervised in regard to his hygiene, taking medications, and his day to day activities.  ECF Dkt. #19 at 14, citing Tr. 133-138. Plaintiff cites to his case manager's notation that he was childlike, forgetful, had difficulty getting along with others, and had difficulty completing daily tasks.  ECF Dkt. #19 at 14, citing Tr. at 140-142.  He also cites to Ms. Lorent's notes that Plaintiff reported seeing dead people and hearing voices

when he was in one group home, and had to be moved to another because he thought the former was possessed.  *Id*. at 129.  Ms. Lorent also opined that Plaintiff could not hold employment because his psychosis symptoms increase under stress and he was dependent upon others.  *Id*. at 564.

Plaintiff further cites to the October 3, 2007, May 14, 2008, June 11, 2008 and November 17, 2008 opinions of Dr. Rodio who found that Plaintiff could not care for his own needs and required the care of his sister and he was markedly limited in maintaining attention and concentration, perform activities within a schedule, respond appropriately to changes in a work setting, maintain regular attendance and punctuality, deal with the public, relate to co-workers, interact with supervisors, function independently without special supervision, work in coordination with others without being distracted, deal with work stresses, complete a normal workday or workweek without interruption from psychologically based symptoms, behave in an emotionally stable manner, and relate predictably in social situations.  ECF Dkt. #19 at 15, citing Tr. at 147-148, 213, 390, 474-475.

Realizing that the most important of the opinions provided to support his meeting of the "B" criteria are those of Dr. Rodio, Plaintiff argues that the ALJ violated the treating physician rule by failing to articulate the reasons why he rejected Dr. Rodio's marked restrictions for Plaintiff.  ECF Dkt. #19 at 17-19.  In his decision, the ALJ gave "great weight" to Dr. Rodio's March 2006 and March 2007 opinions, finding that they were consistent with the evidence and he thus reflected those opinions in his RFC for Plaintiff.  Tr. at 22.  However, the ALJ gave only "some weight" to Dr. Rodio's October 2007, May 2008, June 2008 and November 2008 opinions, finding that Dr. Rodio's greater limitations in those opinions were not consistent with the evidence as a whole, including his own treatment notes and notes from other mental health providers.  *Id*. at 24.

The ALJ is responsible for resolving conflicts in the evidence and weighing the evidence, including medical source opinions.  *Perales*, 402 U.S. at 399.  An opinion on the nature and severity of a claimant's impairment is entitled to controlling weight, but only when: (1) the source giving the

opinion is a "treating source" as defined in the regulations; (2) the opinion is well supported by medically-acceptable clinical and laboratory diagnostic techniques; and (3) the opinion is not inconsistent with other evidence. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r Social Security Admin.*, 378 F.3d 541, 544 (6th Cir. 2004). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001)(citations omitted).

An ALJ must evaluate the factors set forth in 20 C.F.R. §416.927 in determining the weight to give to doctors' opinions. If the ALJ does not attribute controlling weight to the opinions of a treating source, he must examine the factors under 20 C.F.R. § 416.927(c) in order to determine the weight to give to the opinion. 20 C.F.R. § 416.927(c); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004). These factors include the treatment relationship and its length, frequency and nature, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* Moreover, the ALJ must provide good reasons in his decision for rejecting a treating physician's opinion and must provide good reason for the weight that he chose to attribute to that opinion. 20 C.F.R. § 416.927(c)(2); *Pasco v. Comm'r of Soc. Sec*., No. 03-4358, 137 Fed.Appx. 828, 837, 2005 WL 1506343 at **7 (6th Cir. June 23, 2005), unpublished.

The Court finds that the ALJ adequately articulated his reasons for rejecting the most restrictive parts of Dr. Rodio's opinions and substantial evidence supports that decision. The ALJ addressed the "B" criteria of Listing 12.03, which is identical to the "B" criteria of Listing 12.04, finding first that Plaintiff had moderate restrictions in his activities of daily living. Tr. at 20. Neither party disputes this finding and the ALJ cited to numerous instances in the record where it was consistently reported that Plaintiff had adequate hygiene and grooming, including Dr. Rodio's treatment notes indicating that Plaintiff had good hygiene. Tr. at 20, 24, citing Tr. at 149, 433, 464. The ALJ also noted that Plaintiff could cook simple meals and use public transportation. Tr. at 20,

citing Tr. at 239, 461-464.

The parties dispute the ALJ's finding that Plaintiff had only moderate difficulties in social functioning and in maintaining attention and concentration. ECF Dkt. #19 at 14; ECF Dkt. #20 at 14. Plaintiff points to Dr. Rodio's opinions that Plaintiff was markedly limited in both of these areas and argues that the ALJ erred in not affording the opinion of this treating psychiatrist controlling weight. ECF Dkt. #19 at 14. Defendant argues that the ALJ provided adequate articulation of his determination to afford less than controlling weight to these opinions and substantial evidence supports his determination.

The Court agrees with Defendant. The ALJ provided sufficient articulation for the lesser weight given to Dr. Rodio's later opinions concerning Plaintiff's social interaction and attention and concentration limitations. The ALJ noted that while Plaintiff had some paranoid ideations and a child-like demeanor, the record indicated that Plaintiff maintained relationships with his family members, he was in the general population while in prison, and was able to attain his GED and worked as a porter while there. Tr. at 20, citing Tr. at 497, 506-508. The ALJ also found that while Plaintiff lived in a group home upon his release from prison, he had no problems getting along with others there, and he was currently living with his sister and her children. Tr. at 20, citing Tr. at 155, 402, 617-620. Plaintiff testified at the hearing that he had friends at the group homes and he played chess with one of his nephews while living with his sister. *Id.* at 618. This constitutes substantial evidence to support the ALJ's finding to give less than controlling weight to Dr. Rodio's recent opinions concerning marked limitations as to Plaintiff's social functioning and to find that Plaintiff had only moderate limitations in social functioning.

Whether the ALJ adequately articulated his reasons for rejecting Dr. Rodio's opinions that Plaintiff had marked limitations in attention and concentration and whether substantial evidence supports that determination is more questionable. The ALJ actually relied upon Dr. Rodio's earlier

-28-

opinions stating that Plaintiff had sufficient abilities to concentrate, persist and maintain pace for simple tasks. Tr. at 20, citing Tr. at 561-563. However, Dr. Rodio's later opinions state that Plaintiff had marked or poor to no ability to concentrate or pay attention for extended periods of time. Tr. at 147-148, 392, 475.

These opinions are not necessarily inconsistent as Dr. Rodio's earlier opinions conclude that Plaintiff had sufficient attention and concentration abilities for simple tasks, while his latter opinions conclude that he had marked limitations in attention and concentration for extended periods. However, even if they were inconsistent, the Court need not decide this issue because the ALJ adequately articulated his determination that Plaintiff had only moderate limitations in his daily living activities and in social functioning, and because no evidence supports a finding that decompensation existed. Thus, even if the ALJ erred and substantial evidence supported a finding of marked limitations in attention and concentration, Plaintiff would still not meet the "B" criteria of either Listing 12.03 or 12.04 because *two or more* marked limitations are necessary to meet the "B" criteria. Listings 12.03B and 12.04B ("[r]esulting in at least two of the following").

This leaves the issue of whether Plaintiff meets the "C" criteria of both Listings. Plaintiff first asserts that he meets Listing 12.03C3 and Listing 12.04C3 because his group home residence and subsequent living arrangement with his sister establishes that he has a current history of one or more years of an inability to function outside a highly supportive living arrangement with an indication of a continued need for such an arrangement. ECF Dkt. #19 at 17. The ALJ considered Plaintiff's living arrangements and whether the "C3" criteria of Listing 12.03 were met. Tr. at 20-21. The ALJ explained that Plaintiff's living arrangements were not persuasive evidence that Plaintiff required a highly supportive living arrangement because Plaintiff testified that he was placed in a group home as part of his parole. *Id*. However, even if Plaintiff group home residence was considered a highly supportive living arrangement and was due to his mental illness rather than just a condition of his

parole, the ALJ further found that there was no showing that his subsequent living arrangement with his sister was a highly supportive living arrangement. *Id*. at 20. The ALJ also cited to Plaintiff's testimony that he wanted to get his own place to live and treatment notes showing that Recovery Resources and other agencies were helping him to obtain independent living and helping him to get a job so that he could do so, which belied their opinions that Plaintiff was unable to live independently or required a continued need for a highly supportive living arrangement. *Id*., citing Tr. at 154, 179-181, 215, 264, 290.

Based upon these findings by the ALJ, the Court finds he adequately articulated his reasons for giving less than controlling weight to Dr. Rodio's later opinions and substantial evidence supports the ALJ's determination that Plaintiff did not meet or equal Listing 12.03C3 or Listing 12.04C3.

Finally, Plaintiff contends that his impairment meets or equals Listings 12.03C2 and 12.04C2 because his schizophrenia is a "residual disease that has resulted in marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." Listings 12.03C2 and 12.04C2. Plaintiff cites to Dr. Rodio's most recent opinions concluding that his depression and hallucinations significantly impair his capacity to handle stress and work stress and pressure would cause him to withdraw from others and would worsen his hallucinations. Tr. at 562. He concludes that this establishes that he has a residual disease that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate.

The Court finds that the ALJ adequately addressed Listing 12.03C2 (and therefore Listing 12.04C2) and substantial evidence supports the ALJ's determination. The ALJ expressly indicated that he considered the "C2" criteria. Tr. at 20. He referred to his RFC findings in which he gave less than controlling weight to Dr. Rodio's later opinions concluding that Plaintiff's hallucinations would increase with work stress and distract him such that it would impair any work effort. *Id*. at 24. In

affording only "some weight" to these opinions, the ALJ cited to many instances where Plaintiff's medications reduced his hallucinations to nonexistent or minimal and Plaintiff indicated that he was able to ignore or distract himself from any residual shadows or hallucinations. Tr. at 20, citing Tr. at 149, 163, 182, 277, 407. He found that treatment notes repeatedly encouraged Plaintiff to get a job in order to obtain independent housing and they were inconsistent with the treating professionals' opinions that Plaintiff was markedly limited and unable to work and were an indication that providers believed that he could adapt to such a change in his environment. *Id.* at 24, citing Tr. at 154, 179-181, 215, 264, 290. The ALJ further cited to Plaintiff's prison records which showed that Plaintiff was in the general population and was able to go to school and obtain his GED and work as a porter while there. Tr. at 24, citing Tr. at 497, 506-508. Finally, the ALJ cited to treatment notes indicating that Plaintiff's inability to obtain a job stemmed more from his lack of motivation than from his mental impairment. Tr. at 23-24, citing Tr. at 154, 179, 215, 264, 290. The Court finds that these adequately articulated reasons constitute substantial evidence to support the ALJ's determination to afford less than controlling weight to Dr. Rodio's later opinions and to find that Plaintiff's impairment did not meet or equal Listing 12.03C2 or Listing 12.04C2.

**B.** **RFC**

Plaintiff also asserts that substantial evidence does not support the ALJ's RFC determination. ECF Dkt. #19 at 17-22. The Court finds no merit to Plaintiff's contention as presented.

Plaintiff contends that the ALJ failed to adequately evaluate his RFC because he selectively considered the evidence in rejecting Dr. Rodio's later opinions concluding that Plaintiff had marked limitations and instead erroneously relied upon the opinion of one-time examining agency psychologist Dr. Felker. ECF Dkt. #19 at 17-21. The Court has already ruled that the ALJ adequately articulated his reasons for attributing less than controlling weight to portions of Dr. Rodio's later opinions and substantial evidence supported his decision to do so. Accordingly, the ALJ could

attribute greater weight to Dr. Felker's opinion.  Although ALJs are not "bound by the findings made by State agency or other program physicians and psychologists," they "may not ignore these opinions and must explain the weight given to the opinions in their decisions." *Skinner v. Astrue*, No. 3:09-cv-395, 2010 WL 1754173, at *9 (M.D.Tenn. Apr. 30, 2010), unpublished. This is because "[s]tate agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation. *Id*. Therefore, administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence." *Id*. ( citing 20 C.F.R. § 404.1527(f)(2)(I)).

As explained above, the ALJ provided good reasons for attributing less than controlling weight to the most restrictive portions of Dr. Rodio's later opinions.  He cited to the relevant treatment notes and other records that belied those restrictions.  He could therefore rely upon Dr. Rodio's earlier less restrictive limitations for Plaintiff in his RFC and the evaluation and testing of Dr. Felker, who found that Plaintiff could follow routine instructions and who had moderate limitations in dealing with workplace stressors, in attention and concentration, and in relating to others.   The ultimate determination of RFC rests with the ALJ.  20 C.F.R. § 416.927(d)(2).  Substantial evidence from both the medical evidence and evidence of record supports the ALJ's RFC that Plaintiff could perform a full range of work at all exertional levels with restrictions to understanding, remembering and carrying out simple, one-to-two step instructions, only occasional interaction with co-workers and supervisors and no direct interaction with the general public.

**VII.** **CONCLUSION**

Based upon a review of the record, the Statements of Error and the law and analysis provided above, this Court AFFIRMS the ALJ's decision and DISMISSES Plaintiff's complaint in its entirety with prejudice.


Dated: June 19, 2014                                        */s/George J. Limbert*
                                                                    GEORGE J. LIMBERT
                                                                    U.S. MAGISTRATE JUDGE